Filed 10/15/13  McKinney v. Morris CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JOYCE MCKINNEY,<br><br>               Plaintiff and Appellant,<br><br>     v.<br><br>ERROL MORRIS et al.,<br><br>               Defendants and Respondents. | B240830<br><br>(Los Angeles County<br> Super. Ct. No. LC095322) |

APPEAL from the judgment of the Superior Court of Los Angeles County.  James Steele, Judge.  Affirmed.

The Tidrick Law Firm, Steven G. Tidrick, and Andrew L. Younkins for Plaintiff and Appellant.

Sedgwick, Gail E. Kavanagh, John F. Stephens, and Chantal Z. Hwang for Defendants and Respondents.

\* \* \* \* \* \* \* \* \* \*

In 1977, a tabloid media frenzy erupted in England over the arrest of plaintiff and appellant Joyce McKinney, an American former beauty pageant contestant, on charges she had kidnapped Kirk Anderson, a Mormon missionary, chained him to a bed, and forced him to have sex with her for three days. Plaintiff consistently proclaimed her innocence, explaining that Anderson was her fiancé and their weekend getaway at a cottage in Devon was consensual. Plaintiff asserted she had gone to England to rescue Anderson, who she said was brainwashed and coerced by elders in the Mormon Church into making the false claims against her. Media coverage of the story was international, but was primarily undertaken by two competing British tabloids, the *Daily Mirror* and the *Daily Express*. By plaintiff's own admission, she attained a measure of celebrity as a result of the extensive media coverage. After spending some three months in jail awaiting trial, plaintiff was released on bond, and eventually fled England before her trial and returned to the United States. British authorities did not pursue extradition.

In 2008, defendant and respondent Errol Morris, a director who received an Academy Award for best documentary in 2003, saw a report in the Associated Press concerning plaintiff and became interested in her story. Morris and his producing team contacted plaintiff and asked her to participate in an interview about the tabloid press and their tactics. Plaintiff's taped interview became the core of a documentary film, directed by Morris, titled *Tabloid*. *Tabloid* was released in select theaters in July 2011, was featured at numerous film festivals, and was eventually released on DVD.

Plaintiff filed this action against Morris, as well as numerous other entities and individuals associated with the production and distribution of *Tabloid*, alleging she had been defrauded about the nature of the production, coerced into signing a release agreement, and that the film was salacious, false and defamatory in its portrayal of her. Morris and his codefendants filed a special motion to strike pursuant to Code of Civil Procedure section 425.16[1] (hereafter section 425.16), seeking to strike six of the eleven

---

[1]    All further undesignated section references are to the Code of Civil Procedure.

causes of action in plaintiff's complaint. The trial court granted the motion, and plaintiff appealed.

We conclude the challenged causes of action arise from acts by defendants in furtherance of the exercise of their First Amendment rights to free speech on an issue of public interest, and that plaintiff failed to show a probability of prevailing on those claims. Accordingly, we affirm the court's order granting defendants' motion.

FACTUAL AND PROCEDURAL BACKGROUND

### 1.    The Civil Action

On November 2, 2011, plaintiff filed her original complaint stating 11 causes of action:  (1) common law misappropriation; (2) commercial misappropriation of likeness (Civ. Code, § 3344); (3) invasion of privacy/intrusion on seclusion; (4) invasion of privacy/false light; (5) defamation; (6) intentional misrepresentation/fraud; (7) breach of contract; (8) intentional infliction of emotional distress; (9) conversion; (10) unjust enrichment; and (11) violation of Business and Professions Code section 17200.

The gist of plaintiff's complaint is that defendants defrauded and coerced her into participating in the interview with Morris under false pretenses and signing a release consenting to defendants' use of the material in a production about the tabloid press. Plaintiff alleged the story of her trip to England in 1977 to rescue her fiancé from the Mormon church, dubbed the "Manacled Mormon" story by the *Daily Mirror*, was "long dead," that she had carefully attempted to maintain her privacy since that time, and that *Tabloid* resurrected the false and salacious story and took it "to a new, outrageous level." Plaintiff alleged defendants not only defamed her, but ransacked her home and took many personal items and photographs, without her permission, to exploit for use in the film.

### 2.    The Special Motion to Strike

In January 2012, defendants and respondents Morris, IFC In Theaters LLC, IFC Films LLC, AMC Network Inc., Cablevision Systems Corporation, Air Loom Enterprises, LLC, Moxie Pictures Inc., Mark Lipson, John Kusiak, and Milan Entertainment, Inc. (collectively defendants) filed a special motion to strike pursuant to section 425.16, seeking an order striking six of the eleven causes of action in plaintiff's

3

complaint: common law and statutory misappropriation of likeness, invasion of privacy/intrusion on seclusion, invasion of privacy/false light, defamation, and intentional infliction of emotional distress (the "challenged claims").

Defendants argued the challenged claims arose from the exercise of their right to free speech in creating and distributing a documentary film about the tabloid media. Defendants contended plaintiff not only willingly participated in the production, but signed written releases regarding the use of her interview, image and story in the film for which she was paid agreed-upon consideration. Defendants also argued plaintiff was properly characterized as a limited purpose public figure, and required to show defendants acted with actual malice under *New York Times v. Sullivan* (1964) 376 U.S. 254 (*New York Times*). Defendants contended that because the constitutional defense applied to all challenged claims, and plaintiff could not show any defendant acted with actual malice, plaintiff could not establish a probability of prevailing. Defendants further argued the misappropriation claims were barred by the newsworthiness or public interest defense.

### a. Defendants' evidence

In support of their motion, defendants presented the declarations of Morris, Mark Lipson (one of the producers), and several individuals (Ron Gersten, Lisa Pak, Gail Kavanaugh) attesting to the authenticity of the supporting exhibits. The exhibits consisted of copies of the newspaper articles and other documents obtained by Lipson and the production team during research into the Manacled Mormon story; copies of additional articles concerning plaintiff regarding different subjects over the last several decades; copies of correspondence and the release agreements with plaintiff; a DVD containing segments of archival video footage from the British Broadcasting Corporation (BBC) referred to by Lipson as a "screener"; a transcript reflecting the audio portions of the screener video clips; a copy of the "Dialog/Continuity List" for *Tabloid* which reflects the "dialog and written words that appear in the film organized by scene numbers and time measurements"; and a DVD copy of *Tabloid*. We summarize those facts germane to our discussion.

4

Morris has been directing films for over 30 years. In 2008, he saw an Associated Press article dated August 10, 2008, about plaintiff which piqued his interest in her story. The article reported that plaintiff, who was then receiving international press attention for having had her pit bull, Booger, successfully cloned, was the same woman who had garnered extensive media coverage in the 1970's for allegedly abducting a Mormon missionary. Morris was in development with Showtime about a documentary television series addressing the issues of tabloid journalism and celebrity. He thought plaintiff's story would be "a good fit" for the program. He asked Lipson, his producing partner on the project, to contact plaintiff.

Like Morris, Lipson has been involved in filmmaking for over 30 years. He has produced a number of Morris's documentaries. Lipson "spearheaded" the research effort into plaintiff's story, assisted primarily by Ajae Clearway, one of the story producers. They contacted plaintiff about participating in an interview and obtained extensive research materials regarding the tabloid coverage of plaintiff's story in the 1970's, as well as additional news reports concerning plaintiff that appeared over the years.

Lipson spent some eight months and approximately 500 hours of time performing research and talking to potential interview subjects. The research materials he obtained included articles from several British papers and tabloids, and articles from the Associated Press and a Wyoming-based paper, the *Star-Tribune*, among others. Lipson obtained archival video footage of news reports from the BBC as reflected in the screener, and a book based on the Manacled Mormon story by Anthony Delano published in 1978.

Morris and Lipson spoke with plaintiff's British criminal defense attorney, Stuart Elgrod, and attempted to obtain court records from the proceedings but were told the records no longer existed.

Lipson obtained a copy of a 1984 film by Trent Harris, featuring an interview and video footage of plaintiff, portions of which were used in *Tabloid*. Lipson inquired about obtaining copies of an interview plaintiff gave to Tom Snyder for his talk show in

approximately 1978, but ultimately decided against it due to the cost of acquiring the rights.

Lipson also obtained copies of additional news articles related to plaintiff dating from the 1980's through the present, from media outlets like the Associated Press and *People Magazine*, regarding various subjects, including plaintiff's arrest in 1984 in Utah for allegedly stalking Anderson near his work at the Salt Lake City airport, stories related to a dispute with a neighbor in North Carolina that resulted in litigation, and articles in 2008 regarding the successful cloning of her pit bull.

Throughout his career, Morris has generally tried not to have extensive pre-interview discussions with his interview subjects, preferring instead to hear the person's story fresh during the interview process. He does not ask a lot of questions, but rather, lets the interviewee simply "express their story themselves." In talking with plaintiff about arranging a possible interview, Morris found plaintiff to be quite forthcoming in talking about her life experiences. Plaintiff indicated she was familiar with Morris's film work and "excited" about the prospect of working with him.

During discussions to arrange plaintiff's interview, plaintiff told Lipson and Clearway she had been trying to complete a book about her ordeal in England, but that a portion of her materials had been stolen. Lipson told plaintiff he would "scan and digitize" her remaining materials to preserve them for her future use.

Plaintiff's interview took place on September 12, 2009, at a studio in Van Nuys. Clearway and an assistant picked up plaintiff at her home and brought her to the studio. Defendants provided plaintiff with professional hair and makeup services. Plaintiff brought three bins of materials with her to the studio. With plaintiff's permission, Lipson had the materials scanned. At plaintiff's request, Lipson forwarded two DVD's of the scanned materials to plaintiff's father's address in North Carolina.

Plaintiff's interview lasted five or six hours. Plaintiff was a "willing and talkative interview subject. [Morris] found her to be very intelligent and a natural, animated storyteller who use[d] interesting turns of phrase and allusions." Plaintiff "readily" talked about her life, her relationship with Anderson, how her pit bull had saved her life,

and her efforts to have him cloned after his death. Plaintiff never declined to answer any question.

At the conclusion of the interview, Lipson provided plaintiff with a standard release agreement that he and Morris regularly used with interview subjects. Plaintiff said her manager from the Joel Gotler Agency in Beverly Hills would have to review it before she signed it. Lipson contacted Thomas Detrinis at the agency and forwarded him a copy of the release. Several days later, Mr. Detrinis indicated he would advise plaintiff to sign it.

However, when Lipson spoke with plaintiff, she refused to sign it, saying her lawyer advised against it. Lipson suggested they get together over lunch to discuss her concerns. Lipson, Clearway and plaintiff met at a restaurant in Riverside on September 29, 2009. Lipson brought the release agreement, plus a check for the agreed-upon $2,500 consideration. Because plaintiff had repeatedly said she was having difficulty making progress on completing her book, Lipson also brought her a new laptop computer. After going over the release agreement line by line, plaintiff made and initialed a few changes and then executed the release (the 2009 Release).

After lunch, Lipson and Clearway went back to plaintiff's home where she showed them the truck that had been broken into. She had left materials for her book inside and the materials were stolen. Lipson took photographs and plaintiff never objected to him taking the pictures of her, her property or her dogs. Plaintiff posed for several photos with her dogs.

After completing the taped interviews, Morris reviewed the research materials that his production team had compiled. Because of the volume of material, Morris made various editing decisions to pare down the relevant material. For instance, Morris did not use the typed transcript plaintiff said reflected a taped phone call between Anderson and plaintiff that occurred just before her arrest in England. Morris understood plaintiff believed the transcript proved her innocence by showing Anderson's complicity in their meeting, among other things. However, Morris had concerns about its origins, was unable to obtain a copy of the original recording for comparison, and felt it was

7

problematic overall due to numerous handwritten modifications and sections blackened out with a pen. Morris also decided not to reference materials that purported to show plaintiff was arrested on other unrelated charges over the years, because it would reflect negatively on her.

Morris included interview footage with two of the tabloid journalists involved in the coverage of the Manacled Mormon story. Morris wanted the film to show how two of the British tabloids "published wildly different accounts" of plaintiff and the incidents for which she had been arrested. He wanted to show the process of how a story is presented, and it was never his "intention to establish that one story or the other, or neither, is 'the truth.' "

After editing the material, it became apparent to Morris that a 30-minute television episode as part of the overall series originally envisioned for Showtime would not do the story "justice." The agreement with Showtime was terminated, and the material was developed into a full-length documentary film.

Lipson and Morris determined that a new release would need to be signed by plaintiff as the 2009 Release granted rights only as to a Showtime television series. A new release, largely identical to the 2009 Release, was prepared with the primary modification being a granting of rights for the use of plaintiff's interview, image and story in a "documentary film for worldwide theatrical and ancillary distribution" instead of a television series.

Lipson contacted plaintiff in March 2010 to discuss the new release agreement. Plaintiff explained she was busy and upset because of then-pending proceedings by animal control officials against one of her dogs, "Jazz Puppy," for allegedly injuring a woman. Lipson spoke with Morris who agreed they should offer to find an attorney who could help plaintiff with the situation. On plaintiff's behalf, Lipson hired Mark Rosten, an attorney specializing in cases involving animals, as well as an animal behaviorist. Lipson did not personally attend any hearings regarding the dog, but later learned that efforts to save it were not successful.

Lipson went to plaintiff's home in March 2010 and left a copy of the new release with her to sign. He told her they expected the film would qualify for Academy Award submission, which it eventually did, and that they were planning on initially showing it at various film festivals. Several days later, plaintiff faxed him the signed release agreement with some minor handwritten changes (the 2010 Release). Lipson once again returned to plaintiff's home to pick up the hard copy of the executed release and to give plaintiff a check for the additional $5,000 in consideration.

Plaintiff contacted Lipson on a couple of occasions and said certain items were missing from the materials defendants had copied. Lipson went to plaintiff's home and helped her go through the boxes. On both occasions, they were able to locate the items plaintiff thought were missing.

Sometime in early September 2010, a completed DVD copy of *Tabloid* was sent to plaintiff. Defendants also invited plaintiff to the Los Angeles premiere of the film and sent a limousine to pick her up. Plaintiff participated in a question and answer session with Morris after the showing of the film. Lipson took photographs of plaintiff signing a poster for a fan and posing with Morris holding a pink carnation.

### b. Plaintiff's opposition evidence

The opposition evidence consisted of plaintiff's lengthy declaration; the declaration of her expert Dr. Philip S. Wong, a clinical psychologist, regarding the allegedly false subliminal messages in *Tabloid*; and, the declaration of her counsel attesting to the authenticity of the attached exhibits. Plaintiff's exhibits included a copy of the transcription of the phone call between her and Anderson in England just before her arrest which she states reflects her innocence of the charges; copies of correspondence with defendants and various versions of the release agreements; copies of scenes or "screen shots" from *Tabloid* showing images juxtaposed or overlaid with words and phrases that portray plaintiff in a false light; copies of scenes or "screen shots" from *Tabloid* that incorporate unauthorized photographs of plaintiff; a copy of an October 2011 article in *The Guardian* regarding an interview with Morris about the film in which he makes disparaging comments about plaintiff; a copy of a Twitter post from Morris in

9

July 2010 stating "I prefer the truth with some varnish on it. (Where did that nonsensical phrase – the unvarnished truth – come from?)"; several additional documents reflecting advertising or discussions regarding *Tabloid*; copies of photos taken by plaintiff showing various items including a bracelet Lipson brought her as a gift; and a DVD containing video and audio clips of Morris and Lipson discussing *Tabloid* at various venues. We summarize those facts germane to our discussion.

Anderson and plaintiff were deeply in love and engaged to be married. She was a virgin when they met, and she remained faithful and devoted to him. Plaintiff was a former Miss Wyoming, and a petite 112-pound woman at the time, and did not, and could not, force Anderson, who was approximately 300 pounds, to do anything against his will. Plaintiff has always maintained her innocence of the charges brought against her in England.

Following the media frenzy of the late 1970's, plaintiff attempted to live a private life. She lived in remote, rural areas, including for a time with her parents in North Carolina, and eventually moved to her current residence in Southern California. She maintains unlisted phone numbers. When the cloning of her pit bull, Booger, garnered some media attention in 2008, plaintiff intentionally used her middle name, Bernann McKinney, hoping to avoid anyone making the connection with the stories about her from the 1970's.

In August 2009, plaintiff was contacted by Clearway about sitting for an interview with Morris to discuss the tabloid press, their tactics and "how they destroy privacy." Plaintiff was told it would be a short interview to be used in a television series Morris was directing about the tabloid media for the Showtime network. Plaintiff was told it would allow her to "clear [her] name" concerning the publicity she received following her wrongful arrest in England for "carrying away" her fiancé and purportedly "raping" him. Clearway promised plaintiff no defamatory material would be used, no material at all from the *Daily Mirror* would be used, and Morris would provide her with copies of any court records obtained during his investigation. To protect plaintiff's privacy, Clearway also promised plaintiff's home, family members and pets would not be

10

photographed, nor would the location of her home or her contact information be identified or otherwise provided to any journalists or media. Based on those oral representations, plaintiff agreed to be interviewed.

The interview was scheduled for September 12, 2009. Clearway told plaintiff a town car would be sent to pick her up and take her to the studio and home again. However, on the morning of the interview, Clearway showed up at plaintiff's home with several other individuals and "barged rudely" in, stating that photographs, including one of plaintiff as Miss Wyoming, were necessary for the production. Clearway and the other individuals "plundered through" plaintiff's belongings and gathered numerous items, including a suitcase containing an extensive collection of photographs, memorabilia, and articles plaintiff had compiled for use in writing her book about her ordeal in England. While surprised by Clearway's actions, plaintiff believed her representations and allowed the materials to be taken with them to the studio, believing she would assist Clearway in sorting through the materials at the studio to find suitable photographs for defendants' use. However, unbeknownst to plaintiff, defendants went through the materials while she was being interviewed, and scanned them without her knowledge or consent. Numerous items were taken and used in the film without her permission and never returned to her.

During the interview, Morris asked plaintiff about the tabloid media, but then "strayed" into other subjects related to her personal life, like the cloning of Booger, which she felt were not relevant to the production for Showtime as it had been described to her. At no time did Morris ask her questions or ask her to provide evidence refuting the tabloids' claims she had worked as a sex hostess or prostitute. Plaintiff was never invited for a follow-up interview to respond to any of the false comments and representations made by the other individuals interviewed and presented in the film.

At the conclusion of the interview, Lipson asked plaintiff to sign a release agreement regarding the use of the interview footage in defendants' production. Plaintiff refused to sign it, believing the language to be objectionable. Several days later, Lipson sent her another release to sign. Plaintiff still found the language objectionable. She, Clearway and Lipson agreed to meet on September 29, 2009, to discuss modifications to

11

the release agreement. Plaintiff made several handwritten changes and strikethroughs to the agreement and requested that a new document be prepared reflecting her changes. Lipson told her to simply initial the changes and insisted she not have a lawyer look at it before signing. Plaintiff initialed her handwritten changes and then signed the 2009 Release.

During this time, plaintiff discovered that a number of personal items taken from her home by defendants on the day of the interview had not been returned, including photographs of her as a baby, home movies of her family, two film treatments she had written (one titled "A Very Special Love Story" and another concerning the cloning of Booger), private correspondence, and items of memorabilia regarding her relationship with Anderson. She spoke with Lipson about the missing items, but he denied any knowledge of them.

Plaintiff continued to make inquiries to Lipson into the fall of 2009 about the missing items. Lipson began to tell plaintiff she was " 'mentally ill', 'crazy' and should 'go see a psychiatrist.' " Lipson's conduct was particularly upsetting to plaintiff because, at that time, she was trying to save one of her beloved service dogs, Jazz Puppy, from being euthanized by animal control officials.

In March 2010, Lipson contacted plaintiff saying a new release agreement needed to be signed. Lipson began "attempting to blackmail" plaintiff into signing the new release by finally admitting that certain of her personal items had been kept, but that they would be returned to her if she would sign the new release.

Lipson also tried to take advantage of her concern about the fate of Jazz Puppy to coerce her into signing the new agreement. Lipson offered to hire an attorney to help get her dog released. On March 24, 2010, Lipson came to plaintiff's home unannounced, climbed over a fence, and handed her the new release agreement to sign. Plaintiff was distraught and did not have her glasses. Plaintiff has poor vision and could not read the release agreement. Lipson forced her to sign, yelling that her dog would die if she did not cooperate, insisting the release contained "standard" language that a lawyer did not need to review, and ultimately stabbing her hand with a pen in the process of trying to

12

force her to sign. Plaintiff signed the 2010 Release believing Lipson would help her get Jazz Puppy freed. Lipson then failed to do anything and sarcastically joked about the death of her dog after animal control officials euthanized him, claiming to have had someone "rattle" the dog's cage so that he would growl and appear vicious.

In August 2010, Lipson returned to plaintiff's home bearing flowers and a bracelet as a gift. Lipson told plaintiff: "it's a karma bracelet, you're going to get what's coming to you." Lipson continued to lie to plaintiff, failing to explain there was no Showtime television series, but that a movie had been produced instead. He claimed the "television series" would help plaintiff "find a buyer for [her] book and screenplay."

Plaintiff eventually learned *Tabloid* was going to be shown in New York at a documentary film festival in November 2010. Plaintiff went to the showing and saw the completed film for the first time. She became so upset by the lies portrayed in the film, and by the unauthorized personal items exploited in it, that she vomited. Plaintiff never gave any permission or consent to use the personal photographs attached collectively to Lipson's declaration as exhibits 16 and 19, or the copies attached as exhibit 8 to her declaration.

Dr. Philip Wong, a clinical psychologist, was asked to address whether *Tabloid* "presents material in such a manner that the viewer develops beliefs about the Plaintiff, Joyce McKinney, unconsciously, without being aware of the source of those beliefs." Dr. Wong offered his opinion the film contains subliminal messages that could result in viewers obtaining a false view of plaintiff. The film manipulates the viewer's perception, in large part due to the manner in which the material is presented, specifically the flashing of images and words for extremely short periods of time. Dr. Wong stated that in *Tabloid*, the "manipulation of attention and perception leads to material being presented at the fringes of a viewer's awareness, which can facilitate the development of rogue beliefs."

### 3. Synopsis of *Tabloid*

To provide context for the discussion that follows, we include a synopsis of *Tabloid*. The great majority of the film concerns the media coverage of plaintiff that

13

transpired after her arrest in England in 1977, referred to by the parties as the Manacled Mormon story, the moniker given by the *Daily Mirror.*

Plaintiff flew to England in September 1977, along with a friend Keith May, a purported bodyguard named Gil Parker, and Jackson Shaw, a pilot. Parker and Shaw left shortly after arriving in England and are not significant to the story. Plaintiff met Anderson in Utah during college, before he left to undertake missionary work for the Mormon Church. Plaintiff always maintained her trip to England was an effort to rescue Anderson, who she claimed had been sent to England because of his relationship with her. Within a few days of arriving, plaintiff located Anderson and, according to her, they went to a cottage in Devon for three days to share a weekend together. She maintained they planned to be married and that the sexual relations they had were consensual, although plaintiff admitted in an interview with the BBC that she had tied Anderson to the bed, but with ropes, not chains. She explained it was with his consent, and that she had read about it in a book on sexual therapy to address the guilt Anderson had, from the religious teachings of the Mormon Church, about engaging in sex.

The media frenzy began with coverage of the disappearance of Anderson, his reappearance at his church several days later claiming to have been kidnapped and raped, and plaintiff's arrest for "carrying away" Anderson with May's assistance. May was also arrested. There were various reports arising from coverage of the pretrial court proceedings, including some from law enforcement sources, that a fake gun, handcuffs and a bottle of chloroform were found in plaintiff and May's belongings--reports plaintiff denied.

Several notable quotes used repeatedly thereafter in the tabloid press came from plaintiff's reported in-court statements during hearings to determine if she would be held over for trial. One was that she had once been a member of the Mormon Church where she had been given the nickname "Little Miss Perfect." Perhaps the most famous quote was plaintiff's claim she would have "skied nude down Mount Everest with a carnation up [her] nose" to be with Anderson, she loved him so much. Plaintiff was also dubbed the "sex-in-chains girl."

14

After plaintiff was released on bond to await trial, the coverage of plaintiff continued, including several stories of plaintiff at events in London. For instance, there was coverage of her at a movie premier she attended with Peter Tory, a reporter for the *Daily Express*, where she purportedly upstaged Joan Collins in terms of attention from the press. There were also photographs published of her being kissed at a party by Keith Moon, drummer for the rock band The Who, and plaintiff said she was also asked to dance at that party by several members of the band The Bee Gees. After several months free on bail, plaintiff and May fled England, in disguise, with a troupe of deaf actors traveling to Canada.

Once back in the United States, plaintiff contacted the *Daily Express* and offered to give them an exclusive. Tory, the reporter who had been covering the story for months and had gone with plaintiff to the movie premiere, flew to America with a photographer and spent several days interviewing plaintiff and May. In the meantime, the *Daily Mirror* sent reporters to Los Angeles, where plaintiff had an apartment, to dig up information on plaintiff. They reportedly spoke with the apartment manager, Steve Moscowitz. Moscowitz had a key to plaintiff's apartment because he was taking care of her dog while she was gone. Moscowitz apparently took numerous photographs of plaintiff from her apartment, including some nudes, and gave them to the *Daily Mirror* reporters.

During May and June 1978, the *Daily Mirror* and the *Daily Express* presented extensive coverage of plaintiff, each depicting plaintiff in drastically different ways. Under the heading "scoop of the year," the *Daily Express* printed plaintiff's story as she told it to Tory, with some additional commentary by Tory. Plaintiff said the *Daily Express* printed her story accurately ("word for word"), including her accusations against the Mormon Church. The articles, largely casting plaintiff in a positive light, were accompanied by numerous photographs in which plaintiff and May posed, including several in the purported disguises they used because they feared arrest and extradition to England, and one with plaintiff clenching a carnation in her teeth.

The *Daily Mirror* trumpeted its claim of revealing "The Real McKinney," referring to her as a "sex hostess" who earned thousands of dollars selling sex and

15

claiming that is how she earned the money to travel to England. They also printed numerous nude photographs of plaintiff, some of which the *Mirror* claimed were from modeling assignments for sexual bondage magazines.

A smaller portion of *Tabloid* is devoted to additional aspects of plaintiff's life that garnered press attention over the years, including her 1984 arrest in Utah for allegedly stalking Anderson at his work, and the 2008 cloning of plaintiff's dog in Korea.

*Tabloid* opens with a montage of photographs of plaintiff as a child and teenager. It then moves into a brief segment from the 1984 Trent Harris film in which plaintiff reads from her manuscript titled "A Very Special Love Story." The film cuts to a clip of a BBC interview of plaintiff from the 1970's, and then segues to the first segment of plaintiff's interview with Morris, discussing her upbringing and her first meeting with Anderson. The rest of the film consists of alternating segments of the interviews with plaintiff and the other interview subjects, and montages of photographs, cartoons and animated graphics, portions of actual tabloid headlines and articles, and additional artistic elements. There are also a number of video clips from archival BBC news reports about the Manacled Mormon story.

One technique used throughout the film is the overlay of quoted words or phrases from an interviewee over a particular photograph, or the overlay of portions of some of the actual tabloid headlines over a photograph or video still. As an example, several minutes into the film, three separate portions of actual tabloid headlines appear, in succession, on a still image of plaintiff from her interview with Morris: "Joyce McKinney, Ex-Beauty Queen, Joyce McKinney, Sex Hostess, Joyce Mckinney, Little Miss Perfect."

In addition to plaintiff, the individuals interviewed in the film are Troy Williams, a former Mormon missionary and gay rights activist; Shaw, the pilot that accompanied plaintiff and May to England; Tory, the reporter from the *Daily Express*; Kent Gavin, a photographer for the *Daily Mirror* and one of the reporters who went to Los Angeles and obtained the photographs from Moscowitz; and Dr. Jin Han Hong, the doctor in Seoul, Korea who performed the cloning of plaintiff's pit bull. Rarely are any audible questions

16

heard from Morris. The interviewees are filmed talking in a narrative style, largely without interruption. The film notes that May was not interviewed as he passed away several years earlier, Anderson did not respond to requests to be interviewed, and defendants were unable to locate Moscowitz.

### 4. The Trial Court's Ruling

In February 2012, after briefing and oral argument, the court granted defendants' motion. The court determined defendants had established that their conduct in creating and distributing the documentary film *Tabloid* formed the primary basis for plaintiff's claims, and constituted acts in furtherance of their free speech rights. The court also determined the film concerned an issue of public interest, namely tabloid journalism, as well as cultism and the Mormon religion. The trial court therefore concluded defendants had met their threshold burden in showing the challenged causes of action were based on conduct protected by section 425.16. The court determined plaintiff was a limited purpose public figure and she was therefore required to show defendants acted with actual malice under *New York Times* in attempting to establish the probability of prevailing on her claims. The court ruled plaintiff had failed to meet that standard. The court therefore struck the misappropriation claims, the invasion of privacy claims and the defamation claim.

As to the intentional infliction of emotional distress claim, the court ruled that to the extent the cause of action was based on activity protected by section 425.16, it was not viable. However, to the extent it was based on other allegedly outrageous conduct by defendants, the court ruled the cause of action survived to be resolved on the merits with the remainder of plaintiff's tort and contract claims. Plaintiff filed this appeal challenging the court's order granting defendants' motion.

### DISCUSSION

"A ruling on a section 425.16 motion is reviewed de novo. [Citation.] We review the record independently to determine whether the asserted cause of action arises from activity protected under the statute and, if so, whether the plaintiff has shown a probability of prevailing on the merits." (*Stewart v. Rolling Stone, LLC* (2010) 181

17

Cal.App.4th 664, 675 (*Stewart*); accord, *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

### 1. Section 425.16

Section 425.16 was enacted to provide a procedure for the early dismissal of causes of action that infringe on the exercise of the constitutional rights to free speech and to petition for a redress of grievances. "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) To better effectuate the statutory purpose of safeguarding the valid exercise of the rights to free speech and to petition for a redress of grievances, the Legislature amended section 425.16 in 1997 to expressly declare the statute "shall be construed broadly." (§ 425.16, subd. (a); Stats. 1997, ch. 271, § 1.)

In resolving a special motion to strike under section 425.16, the court engages in a two-step analysis. The court must first determine whether the moving defendant "has made a threshold showing that the challenged cause of action is one arising from protected activity." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).) If the court determines the defendant met this initial burden, "it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Ibid.*) "In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) Only those causes of action that satisfy "*both* prongs" of section 425.16, i.e., arise from protected activity and lack minimal merit, are subject to being stricken under the statute. (*Navellier,* at p. 89.)

**2.  Step One:  Defendants Established the Challenged Causes of Action Arise From Conduct in Furtherance of the Exercise of Their First Amendment Right to Free Speech on a Public Issue**

The critical consideration in resolving whether a defendant has satisfied the first prong of the statute is determining whether the challenged claims arise from the defendant's protected free speech or petitioning activity.  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.)  Subdivision (e) of section 425.16 describes four categories of protected conduct within the meaning of subdivision (b)(1).  Such conduct includes oral and written statements made in a public forum in connection with a public issue and, as relevant here, "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e)(4).)

In her causes of action for defamation, invasion of privacy, misappropriation and intentional infliction of emotional distress, plaintiff seeks to impose liability on defendants for their conduct in "writing, filming, produc[ing], and distribut[ing] the film '*Tabloid*,' " publicizing and promoting the film through the distribution of trailers and posters, and presenting false depictions of her in the film.  This was undeniably conduct in furtherance of defendants' exercise of their free speech rights protected by the First Amendment within the meaning of section 425.16, subdivision (e)(4).

"Film is a 'significant medium for the communication of ideas' and, whether exhibited in theaters or on television, is protected by constitutional guarantees of free expression."  (*Polydoros v. Twentieth Century Fox Film Corp.* (1997) 67 Cal.App.4th 318, 323-324; accord, *Joseph Burstyn v. Wilson* (1952) 343 U.S. 495 [expression by means of film is protected by First and Fourteenth Amendments]; see also *Stewart*, *supra*, 181 Cal.App.4th at p. 682 [First Amendment protects " 'all forms of expression . . . written and spoken words (fact or fiction), music, films, paintings, and entertainment' " sold for profit or not]; *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143 (*Tamkin*) ["creation of a television show is an exercise of free speech"].)

Plaintiff does not argue the making of a film is not an exercise of free speech. Rather, plaintiff contends the subject matter of the film *Tabloid* does not concern a public issue or a matter of public interest within the meaning of the statute. We disagree.

Section 425.16 does not expressly define "public interest," but, it does mandate the statute is to be construed "broadly." (*Id.*, subd. (a).) Moreover, a "public" issue need not concern a matter related to the "lofty" goal of self-government or otherwise be "significant." (*Navellier*, *supra*, 29 Cal.4th at p. 91; see also *Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1042 (*Nygard*) [public interest present where allegedly defamatory magazine article concerned prominent Finnish businessman of "extensive interest" to Finnish public]; *Seelig v. Infinity Broadcasting Corporation* (2002) 97 Cal.App.4th 798, 807-808 [public interest present regarding on-air comments made by radio talk show hosts about contestant in popular reality television show].)

To qualify as protected activity under the statute, it is sufficient for the issue to be one in which the general public takes an interest. (*Nygard*, *supra*, 159 Cal.App.4th at p. 1042; accord, *Tamkin*, *supra*, 193 Cal.App.4th at p. 143.) Stated another way, a "statement or other conduct is made 'in connection with a public issue or an issue of public interest' (§ 425.16, subd. (e)(4)) 'if the statement or conduct concerns a topic of widespread public interest and contributes in some manner to a public discussion of the topic.' [Citation.]" (*Stewart*, *supra*, 181 Cal.App.4th at p. 677.)

Plaintiff contends defendants did not satisfy the public interest requirement of section 425.16, subdivision (e)(4) because the only themes in *Tabloid* are plaintiff's "life, personality and role in the Manacled Mormon story." Plaintiff contends those issues may have been a matter of public interest in England some 30 years ago, but are not, and were not ever, a matter of public interest in America at any time.

As support for this argument, plaintiff relies primarily on *Dyer v. Childress* (2007) 147 Cal.App.4th 1273 (*Dyer*), in which the denial of a screenwriter defendant's special motion to strike was affirmed on appeal. The plaintiff there was a private individual who had known the defendant in film school, and sued over the misuse of his persona when a fictional character in defendant's screenplay was given the same name as plaintiff. (*Id.* at

20

pp. 1276-1277.) The screenplay was made into the movie *Reality Bites* (Jersey Films; Universal Pictures 1994). The appellate court rejected the defendant's contention the challenged conduct qualified as protected activity on the theory the fictional movie addressed the broad popular theme of the challenges facing "generation X" in the 1990's. The court explained that in determining whether the defendant's conduct was a qualifying act within the meaning of the statute, "we focus on the specific nature of the challenged protected conduct, rather than generalities that might be abstracted from it." (*Id*. at p. 1279.) Noting that the specific dispute concerned the misuse of the plaintiff's persona by portraying him as a "rebellious slacker," the court found there was no discernible public interest in the plaintiff's persona. "Although Reality Bites may address topics of widespread public interest, defendants are unable to draw any connection between those topics and [plaintiff's] defamation and false light claims." (*Id.* at p. 1280.)

Here, in contrast, the specific nature of defendants' challenged conduct is intertwined with the film's overall focus on tabloid journalism. Plaintiff's opposing declaration makes plain the challenged claims are based on the creative decisions made by defendants in presenting her story in the context of the larger issues of the tabloid media frenzy that surrounded her arrest and how the tabloid media chose to pursue and present her story. She complains she was presented in a false light because her story was juxtaposed with the false and derogatory versions presented by the tabloids, and that the "prevaricating" tabloid reporters calling her a prostitute are presented as telling the truth, while she is presented as a liar. *Dyer* is of no assistance to plaintiff because she acknowledges the role her story plays in the film's portrayal of tabloid journalism.

At oral argument, counsel for plaintiff argued *Tabloid* cannot be found to concern the broader subject of tabloid journalism because it does not provide any direct critical analysis of tabloid journalism and does not discuss or compare other instances of tabloid tactics, but instead focuses entirely on the personal narrative of plaintiff's life experiences. We reject the notion the documentary film would have had to include academic discussion or critique of tabloid journalism to satisfy the first prong of the statute. Defendants made the creative decision to showcase plaintiff's rather dramatic

21

experiences with the tabloid media to portray how events are presented and distorted in the tabloid press. This does not mean *Tabloid* does not concern the subject of tabloid journalism. What is left unsaid, leaving the viewer to draw his or her own conclusions, may speak volumes and is not a less deserving form of expression than the direct and obvious.

We conclude defendants' film presents a view of how the tabloid media operates as seen through the lens of plaintiff's personal experiences in the maelstrom of the Manacled Mormon media circus. The film also includes additional aspects of plaintiff's personal life, like the later publicity she received over the cloning of her dog. But, the overall theme of *Tabloid* nevertheless concerns the broader subject of tabloid journalism, and not merely plaintiff's persona. The subjects of tabloid journalism and the oftentimes questionable tactics of tabloid reporters and paparazzi photographers are matters of widespread public interest. Along with the related issues of the overnight rise of "celebrities" from tabloid coverage and reality television, the subject is so prevalent, it borders on a societal obsession. It is not mere coincidence *Tabloid* was released, as defendants note, at a time when the *News of the World* phone-hacking scandal was making international headlines. It serves to underscore that issues related to tabloid journalism are of widespread public interest, and have been for years. It is indisputable the film, whatever its artistic merit, contributes "in some manner to a public discussion" of that topic. (*Stewart*, *supra*, 181 Cal.App.4th at p. 677.)

Defendants discharged their initial movant's burden to show the challenged claims were based on conduct protected by section 425.16, thus shifting the burden to plaintiff to establish the probability of prevailing on her claims.

3.      **Step Two:  Plaintiff Did Not Show a Probability of Prevailing on Any of the Challenged Causes of Action**

To defeat a section 425.16 motion, a plaintiff must state and substantiate a legally sufficient claim. (*Navellier*, *supra*, 29 Cal.4th at p. 88.)  " 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence

22

submitted by the plaintiff is credited." ' [Citation.]" (*Id*. at pp. 88-89.) While the court does not weigh credibility or "the probative strength of competing evidence [citation], the motion to strike should be granted if the defendant 'defeats the plaintiff's showing as a matter of law, such as by establishing a defense or the absence of a necessary element.' [Citation.]" (*Carver v. Bonds* (2005) 135 Cal.App.4th 328, 344; accord, *Tamkin*, *supra*, 193 Cal.App.4th at p. 145.)

In arguing plaintiff could not establish a probability of prevailing, defendants raised several defenses to the challenged causes of action, including: (1) a constitutional defense based on the First Amendment invoking the *New York Times* actual malice standard; (2) the defense of privilege to present plaintiff's interview and story in the film based on her express written consent in the 2010 Release; and (3) the common law and statutory defense of newsworthiness or public interest. We conclude defendants presented evidence establishing the applicability of the First Amendment defense, as well as the newsworthiness or public interest defense, and that plaintiff failed to meet her burden in substantiating the challenged causes of action.

### a. *New York Times*

Under *New York Times* "[i]f the person defamed is a public figure, he cannot recover unless he proves, by clear and convincing evidence [citation], that the libelous statement was made with ' "actual malice" -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' [Citation.]" (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256 (*Reader's Digest*).) " '[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. [Rather,] [t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.' [Citation.]" (*Id*. at pp. 256-257.)

The *New York Times* standard has been held to "apply to all claims whose gravamen is the alleged injurious falsehood of a statement: '[that] constitutional protection does not depend on the label given the stated cause of action' [citation], and no

23

cause of action 'can claim . . . talismanic immunity from constitutional limitations[.]' [Citation.]" (*Blatty v. New York Times Company* (1986) 42 Cal.3d 1033, 1042; accord, *Reader's Digest*, *supra*, 37 Cal.3d at p. 265 [actual malice standard for public figure plaintiff applies to claims for intentional infliction of emotional distress and both false light and intrusion on seclusion invasion of privacy claims]; *Tamkin*, *supra*, 193 Cal.App.4th at p. 149 [same]; *Stewart*, *supra*, 181 Cal.App.4th at p. 682 [applying *New York Times* standard to claims for common law and statutory misappropriation].) The defense applies to all of the challenged causes of action.

### b. Public figures

Several years later in *Gertz v. Robert Welch* (1974) 418 U.S. 323 (*Gertz*), the court refined the definition of public figures subject to the *New York Times* actual malice standard. The public figure designation "may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. *More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.* In either case such persons assume special prominence in the resolution of public questions." (*Id*. at p. 351, italics added.) In so clarifying, the court underscored its intent to assure "to the freedoms of speech and press that 'breathing space' essential to their fruitful exercise." (*Id*. at p. 342.)

In characterizing a plaintiff as a limited purpose public figure, "[i]t is not necessary to show that a plaintiff actually achieves prominence in the public debate; *it is sufficient that* '[*a plaintiff*] *attempts to thrust himself* [*or herself*] *into the public eye'* [*citation*] *or to influence a public decision*." (*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 845-846, italics added; accord, *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 25 [plastic surgeon was limited purpose public figure regarding subject of plastic surgery based on voluntary acts of writing articles in medical journals and beauty magazines and appearing on local television shows "touting the virtues of cosmetic and reconstructive surgery"].) Public figure status is judged under a totality of circumstances approach, with the focus

on whether the individual undertook some voluntary or affirmative act to influence or participate in a public issue. (*Reader's Digest*, *supra*, 37 Cal.3d at pp. 253-255.)

### c. Plaintiff is a limited purpose public figure

The trial court found plaintiff was a limited purpose public figure. "On appeal, the trial court's resolution of disputed factual questions bearing on the public figure determination is reviewed for substantial evidence, while the trial court's resolution of the ultimate question of public figure status is subject to independent review for legal error." (*Khawar v. Globe International* (1998) 19 Cal.4th 254, 264 (*Khawar*).) We agree plaintiff is properly characterized as a limited purpose public figure in the context of this dispute. (*Reader's Digest*, *supra*, 37 Cal.3d at pp. 253-254 [limited purpose public figure subject to actual malice standard only as to allegedly defamatory publications related to his or her role in the public issue].)

By expressly agreeing to participate in a taped interview to be used in a production for a broad public audience, plaintiff voluntarily and affirmatively injected herself into a public discussion about the tabloid media, their tactics and how they purportedly present or misrepresent the truth, and "destroy" privacy. While plaintiff argues she was misled about the final format of the production, she does not deny she was willing to give a taped interview and participate in a production for a Showtime television series regarding the tabloid media, explaining her experiences and expressing her opinions about the subject. In the film, plaintiff speaks openly and with great conviction about her opinions regarding the conduct of the tabloid reporters that covered her story, as well as repeated references to the Mormon Church being a cult and the powerful entity that she believes was behind the false accusations against her and which ultimately resulted in her arrest and the unwanted media attention.

Moreover, plaintiff's own evidentiary submissions undercut her assertion she is not properly characterized as a limited purpose public figure. Plaintiff stated in her declaration she received numerous offers to tell her story over the past 35 years from "several media outlets", including a lucrative offer from *Penthouse Magazine*. She states she refused to participate in any of them in order to protect her privacy and maintain

25

control of her "public image." But the numerous offers were nonetheless made, demonstrating the public remained interested in her story over the course of the 35 years since it was first published. She also indicated she had not yet published her own book about her ordeal because she has been trying to find "the proper venue for [her] cult rescue saga." While couched in language attempting to show her efforts to stay out of the limelight, plaintiff's statements nonetheless reflect her belief there is a continuing public interest in her story since she believes there is a market for her own book and/or screenplay.

In several segments of her interview in *Tabloid*, plaintiff describes the celebrity status she attained following her arrest in England. She described herself as being "suddenly a celebrity" and "a phenomenon," and that she received thousands of letters from the public sympathizing with her predicament, as well as numerous marriage proposals. She said that upon her release on bail, she found her bed and breakfast in London filled with dozens of pink carnations (presumably all in reference to plaintiff's widely reported "carnation" quotation from the court proceedings). Plaintiff said "when you're famous," you learn who your true friends are. Once back home in America and living with her parents in North Carolina, plaintiff explained that even though they lived in a rural area, the paparazzi came by regularly and hounded her. She bought a guard dog to keep people from coming up to the house. She said this behavior went on "like that for years." Such statements belie the claim there was no interest in plaintiff's story in America, or in the years after she returned from England.

Plaintiff raised factual disputes about the validity and scope of both the 2009 and the 2010 Releases, as well as the alleged misrepresentations made to her about the nature of the film production. However, plaintiff does *not* deny she voluntarily agreed to participate in a production which she believed would be shown as a series on the Showtime network, and to express her opinions about the tabloid press and how "they destroy privacy." It is therefore beyond dispute plaintiff willingly injected herself into a public discussion about the tabloid press and how it operates, based on her own firsthand experiences, and that she sought to articulate her beliefs for use in the program in a

26

manner to influence public opinion about those subjects. On such facts, plaintiff is properly characterized as a limited purpose public figure. (*Gertz*, *supra*, 418 U.S. at p. 351.)

### d. Actual malice

Because plaintiff is a limited purpose public figure with respect to claims arising from the production and distribution of *Tabloid*, plaintiff was required to show clear and convincing evidence defendants acted with actual malice.

The "actual malice" standard is a *subjective* test, "under which the defendant's actual belief concerning the truthfulness of the publication is the crucial issue. [Citation.] This test directs attention to the 'defendant's attitude toward the truth or falsity of the material published . . . [not] the defendant's attitude toward the plaintiff.' [Citation.]" (*Reader's Digest*, *supra*, 37 Cal.3d at p. 257.) "[O]therwise stated, 'there must be sufficient evidence to permit the conclusion that the defendant . . . had a "high degree of awareness of . . . probable falsity." ' [Citation.]" (*Khawar*, *supra*, 19 Cal.4th at p. 275.) "To prove actual malice, therefore, a plaintiff must 'demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubts as to the truth of his statement.' [Citation.]" (*Ibid*.)

The primary evidence relied upon by plaintiff to show actual malice included: (1) the conduct by Lipson purportedly showing ill will or hostility toward plaintiff in the handling of her personal materials, the death of her dog, and in the process of obtaining her signature on the release agreements; (2) statements made by Morris and Lipson about the film; and (3) Morris's failure to include certain material in the film.

Assuming it is true that Lipson was insensitive, even boorish, regarding plaintiff's service dog, her purportedly missing personal items, and the efforts to obtain plaintiff's signature on the 2010 Release, that does not demonstrate Lipson, Morris, or anyone involved in creating *Tabloid* harbored doubts about the accuracy of the material presented in the film. Even assuming plaintiff's evidence raises an inference of ill feelings or callousness toward plaintiff personally, the focus of inquiry is on defendants' subjective

beliefs about the truth or falsity of the material presented in the film, not defendants' attitude toward plaintiff. (*Reader's Digest*, *supra*, 37 Cal.3d at p. 257.)

Plaintiff's reliance on the statements made by Lipson and Morris during promotional events and at postscreening question and answer sessions with audience members is similarly unavailing. One of the clips presented is of Lipson speaking with audience members after a showing. The pertinent quotation, according to plaintiff, is where Lipson says he does not "want to know the truth" about what really happened between plaintiff and Anderson. However, he then adds that it is probably not possible to know the whole truth. With respect to plaintiff, Lipson says that she was quite willing to tell her story and "I think we did a good job" of presenting it. No other quotations are presented indicating any subjective belief by Lipson that any of the material included in *Tabloid* was inaccurate or that he harbored ill will toward plaintiff.

The balance of the audio and video clips are of Morris at various venues discussing or promoting the film. In one clip, Morris says he believes the essence of tabloid journalism, which has always depended on sensationalism, was revealed by Tory's statement in the interview, without any apparent self-consciousness, that he thinks plaintiff actually used ropes to tie up Anderson, but he reported she used chains because chains just sounded "better." In another clip, after reiterating the extremes pursued by tabloid journalists to get a story and sell papers, even resorting to fabrication, Morris says he believes the heart of any real journalism must be the pursuit of the truth and that reality is stranger than fiction and makes for good storytelling.

At another venue, Morris is asked if he believes plaintiff's version of what occurred. Morris states he cannot be sure. He believes plaintiff's position that a woman cannot rape a man, but as to all the details, he explains it is difficult to know for sure because the story, having largely taken place in private, is dependent on subjective first person narratives. He says ultimately we are all "unreliable narrators" to some degree. Morris believes there are issues surrounding what happened that are unresolvable. In putting together the film, he found there were questions he simply could not answer definitively, but he put in those facts which he believed to be true, to the extent the

28

absolute truth can be known.  Morris concedes he was less interested in attempting to ascertain the absolute truth, and more interested in telling the story of how the tabloids portrayed plaintiff.  He explains the tabloids chose to present two divergent stories of plaintiff, one of her as a whore, the other as a virgin, and neither is true.

In yet another clip, Morris explains he does not engage in "adversarial" interviewing, trying to "badger" the interviewee with embarrassing questions.  Morris feels that type of interviewing interferes with the interviewee's ability to tell their story.  He says he believes it is important to pursue the truth, but to let people tell their version of their story, from their perspective.  Morris states the majority of *Tabloid* is plaintiff telling her own story, which he found to be rich and complex, and he tried to portray that complexity.

Plaintiff also fails to show Morris's Twitter comment was made in relation to anything having to do with plaintiff or the film *Tabloid*.  "I prefer the truth with a little varnish on it" is simply a colorful statement of opinion that does not assist plaintiff.  Morris's statement in *The Guardian* article about plaintiff having gone to England with "heavies" also does not suffice.  It is not disputed plaintiff went to England with three men to find Anderson, at least one of whom she described as a "bodyguard."  Defendants also obtained numerous articles reporting that law enforcement officials had said a fake gun and other items were found in plaintiff's belongings upon her arrest.  The fact Morris may be ambivalent about plaintiff's true motives in going to England, based on that information, does not translate into proof he harbored serious doubts about the truth of any fact presented in the film.  *Tabloid* presents those facts in addition to plaintiff's version that no kidnapping at all took place.

Additional quotations from Morris include:  "I tried to create a sympathetic and loving portrayal of Joyce.  She looks great in the movie.  She is a powerful and convincing presence"; she is "fabulous"; and, "I like Joyce.  I still find Joyce endlessly fascinating."

The Morris and Lipson quotations, whether viewed singly or cumulatively, do not constitute clear and convincing evidence of actual malice.  None shows that defendants

29

" ' "had a high degree of awareness of . . . probable falsity" ' " or " 'subjectively entertained serious doubts as to the truth' " of any material included in the film. (*Khawar*, *supra*, 19 Cal.4th at p. 275.) Most of the statements, read in context, actually defeat a finding of actual malice as they reflect Morris's and Lipson's subjective beliefs they did not feel it was possible to know the absolute truth. The statements show the movie presents, in essence, an open-ended, unresolvable question about what actually happened, how the truth can be manipulated or obscured, or even innocently altered by each narrator's own subjective view of the circumstances.

Morris's decision to not include certain material, such as the transcript of the telephone conversation between Anderson and plaintiff, also is of no assistance to plaintiff. Morris explained that various editing choices had to be made because of the volume of material, and with respect to that specific document, he was unable to establish its origins and was concerned about including it because of the modifications that had been made to it. Morris did include a portion of plaintiff's interview discussing the taped phone conversation and how that ultimately led to her arrest. Morris also expressly stated that he chose to edit out certain materials specifically because he did not feel they were germane and could reflect negatively on plaintiff.

Lack of actual malice is further bolstered by the fact defendants included material in *Tabloid* bearing on the credibility of the tabloid journalists. Tory, from the *Daily Express*, is referred to as a "gossip columnist." The film includes a segment from his interview in which he laughingly admits he understood plaintiff had purportedly tied up Anderson with ropes, but "chains sounds better," explaining the genesis of the "sex-in-chains" reference that became ubiquitous for all media outlets in discussing the story. In another segment, Tory admits he feels plaintiff used him in a manner of speaking by going to the premiere and being seen in public when, all the while, she planned to flee England. His bias appears plain and no reasonable viewer would place great weight on his hyperbolic statements of opinion, such as referring to plaintiff as "barking mad," referencing both the dog cloning and Manacled Mormon stories.

Gavin, the photographer from the *Daily Mirror*, is shown laughing about plaintiff's purported suicide attempt after learning of the *Mirror*'s article called "The Real McKinney" portraying plaintiff as a prostitute. A segment of his interview is also included in which he admits the *Mirror*, after obtaining the photographs from Moscowitz (some of which he apparently took from plaintiff's apartment), paid for Moscowitz to go to Mexico so that he would not be located or speak with anybody else about the information and photographs he had taken from plaintiff's apartment and given to the *Mirror*. He is also shown stating the negatives of the nude photographs of plaintiff that were published in the *Mirror* which would purportedly show that none of the photographs had been altered (plaintiff claimed many of the photos had been) were inexplicably lost when the ownership of the paper changed.

Moreover, the record shows plaintiff publicly admitted to many of the facts and much of the material presented in *Tabloid*. In taped interviews for the BBC during 1977 and 1978, in articles with the *Daily Express* and/or during the interview footage for *Tabloid*, plaintiff admitted: she had tied Anderson to the bed with ropes, with his consent, because she read about it in a book about sexual therapy and she was trying to help Anderson who was "sexually repressed" and "brainwashed" by the Mormon Church; she worked for several days on an "odd" modeling assignment booked for her by an unethical agent when she was a struggling actress, but had no idea the photographs would be used in a bondage-style publication; she posed nude in numerous photographs but explained they were intended to be private and solely for Anderson, and Moskovitz gave them to the *Daily Mirror* without her permission; she explained she gave massages but declined to answer whether she ever earned money for doing so; she went to England with "two bodyguards" to rescue Anderson because she feared the response of the church; while out on bail awaiting trial, plaintiff obtained and used the birth certificates of two deceased individuals for her and May to use and made disguises for them to leave the country; she went to Utah in 1984 and saw Anderson at the airport, but was not stalking him as she only went to find out what he was doing to have a proper ending for her manuscript about their relationship.

31

Plaintiff further argues the declaration of her expert went unchallenged by defendants. It is true defendants did not challenge Dr. Wong's declaration. However, the opinions offered by Dr. Wong address, at most, the possibility that some viewers of *Tabloid* could be led to believe, on a subliminal level, the negative image of plaintiff presented by the tabloid papers was true. Even assuming his declaration raised sufficient admissible evidence in that regard, it is not evidence showing any defendant acted with actual malice in creating and distributing the film.

Plaintiff also suggests defendants' ill will toward her may be inferred by their failure to allow her to directly address the tabloid claims against her. But, *Tabloid* just rehashes how the media circus around the Manacled Mormon story unfolded in 1977 and 1978, with the bulk of the interview footage used in the film coming from plaintiff herself. Plaintiff was fully aware of the scope of the claims made against her by the tabloids. Over the years, she has consistently and repeatedly denied and provided explanations for the more salacious of tabloid claims, including that she worked as a prostitute. Plaintiff does not provide any evidence that Morris or any defendant prevented her, during her interview for the film, from explaining or refuting in greater detail the claims she had worked as a prostitute and had posed as a model for bondage magazines. She says only she was not specifically asked questions about those issues or asked back for a follow-up interview. Neither of these claimed failings on the part of defendants raises any inference of actual malice.

Plaintiff's inability to present clear and convincing evidence of actual malice is fatal to all of the challenged claims. (*Reader's Digest*, *supra*, 37 Cal.3d at p. 265 [actual malice standard for public figure plaintiff applies not only to defamation but to claims for intentional infliction of emotional distress and false light and intrusion on seclusion invasion of privacy claims]; *Tamkin*, *supra*, 193 Cal.App.4th at p. 149 [same]; *Stewart*, *supra*, 181 Cal.App.4th at p. 682 [applying actual malice standard to common law and statutory misappropriation claims].) As the Supreme Court has explained, "liability cannot be imposed on any theory for what has been determined to be a constitutionally

32

protected publication." (*Reader's Digest*, *supra*, at p. 265.) The claims were properly stricken pursuant to section 425.16.[2]

####        e.        Newsworthiness or public interest defense

Plaintiff's claims for common law and statutory misappropriation (Civ. Code, § 3344) include allegations that defendants misappropriated, without her valid consent, some of her personal photographs and videotapes and used them in *Tabloid* or in the promotional materials for the film.

There are two types of common law misappropriation claims. (*Dora v. Frontline Video, Inc*. (1993) 15 Cal.App.4th 536, 541-542 (*Dora*).) One type is the more common right of publicity. "The other is the appropriation of the name and likeness that brings injury to the feelings, that concerns one's own peace of mind, and that is mental and subjective." (*Id*. at p. 542.) California recognizes a "public interest" defense to a common law claim for misappropriation of one's name or likeness. (See *Stewart*, *supra*, 181 Cal.App.4th at p. 680; accord, *Dora*, *supra*, at pp. 542-543.) The public interest defense is similar to the newsworthiness exemption or defense applicable to a statutory claim for commercial misappropriation. (*Stewart,* at p. 680; *Dora,* at pp. 544-546.) Subdivision (d) of Civil Code section 3344 provides: "For purposes of this section, a use of a name, voice, signature, photograph, or likeness in connection with any news, public

---

[2]        Plaintiff's cause of action for invasion of privacy/intrusion into seclusion includes allegations defendants gave plaintiff's unlisted private cell phone number and address to third parties and media outlets and showed images of her home. Because plaintiff failed to discuss this aspect of her claim in her briefs, we consider the matter waived. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [appellate court need not " 'consider points which are not argued or which are not supported by citation to authorities or the record' "].) In any event, the record establishes the claim fails on the merits because plaintiff provided her contact information to defendants (they did not obtain her contact information surreptitiously), and she presented no evidence whatsoever that they gave her contact information to any third party or otherwise showed any identifiable aspect of her home in *Tabloid.* (See *Hernandez v. Hillsides, Inc*. (2009) 47 Cal.4th 272, 286-288 [discussing elements of intrusion into seclusion cause of action].)

affairs, or sports broadcast or account, or any political campaign, shall not constitute a use for which consent is required under subdivision (a)."

The public interest or newsworthiness defense has been construed broadly to protect the valid exercise of First Amendment rights. (See, e.g., *Gionfriddo v. Major League Baseball* (2001) 94 Cal.App.4th 400, 410-411 ["Entertainment features receive the same constitutional protection as factual news reports" and the "public interest is not limited to current events; the public is also entitled to be informed and entertained about history."]; accord, *Stewart*, *supra*, 181 Cal.App.4th at p. 681; *Maheu v. CBS, Inc.* (1988) 201 Cal.App.3d 662, 676-677 (*Maheu*).)

In *Dora*, the plaintiff had been well-known in the Malibu surfing community some two decades earlier. (*Dora*, *supra*, 15 Cal.App.4th at p. 540.) Since that time, he had led a relatively private life and took offense to the defendants' use of photographs of him surfing, as well as an audiotape of an interview he had given, in a video documentary about surfing they had produced. (*Id.* at pp. 540-541.) The plaintiff sued the defendants for the unauthorized use of his name, voice and likeness in the documentary. (*Ibid.*)

In affirming summary judgment in favor of the defendants, the court explained: "Whether [plaintiff] is considered a celebrity or not, whether he is seeking damages for injury to his feelings or for the commercial value of his name and likeness, we conclude that the public interest in the subject matter of the program gives rise to a constitutional protection against liability." (*Dora*, *supra*, 15 Cal.App.4th at p. 542.)

The court also explained the basis for an expansive interpretation of the statutory exemption: "Civil Code Section 3344, subdivision (d) distinguishes between news and public affairs. We presume that the Legislature intended that the category of public affairs would include things that would not necessarily be considered news. Otherwise, the appearance of one of those terms in the subsection would be superfluous, a reading we are not entitled to give to the statute. [Citation.] We also presume that the term 'public affairs' was intended to mean something less important than news. [Citation.] Public affairs must be related to real-life occurrences. As has been established in the cases involving common law privacy and appropriation, the public is interested in and

34

constitutionally entitled to know about things, people, and events that affect it. For that reason, we cannot limit the term 'public affairs' to topics that might be covered on public television or public radio. To do so would be to jeopardize society's right to know, because publishers and broadcasters could be sued for use of name and likeness in documentaries on subjects that do not relate to politics or public policy, and may not even be important, but are of interest." (*Dora*, *supra*, 15 Cal.App.4th at pp. 545-546.)

As we have already explained at length above, *Tabloid* concerns a subject of widespread public interest. The public interest or newsworthiness exemption is properly applied here to defeat plaintiff's claims. Plaintiff has not persuaded us there is any sound reason for not following *Dora*, *Maheu* and *Stewart*.

## DISPOSITION

The court's order of February 24, 2012, granting defendants' motion is affirmed. Defendants shall recover their costs on appeal, as well as reasonable attorney fees on appeal pursuant to section 425.16, subdivision (c)(1).


GRIMES, J.

We concur:


BIGELOW, P. J.


FLIER, J.

35